Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

ORIGINA

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | Morton Denlow |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 209 - 5 | **DATE** | 5/31/2000 |
| **CASE TITLE** | USA vs. Frederick Davis | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing held.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation recommending that Defendant Frederick Davis' motion to suppress evidence [51-1] be denied is hereby entered on record. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |

number of notices

JUN 01 2000
date docketed

docketing deputy initials

5/30/2000
date mailed notice

DK
courtroom deputy's initials

00 MAY 31 PM 4:13

Date/time received in central Clerk's Office

DK
mailing deputy initials

Document Number

62

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

JUN 0 1 2000

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 00 CR 209-5 |
| | ) | |
| v. | ) | |
| | ) | |
| FREDERICK DAVIS, | ) | Magistrate Judge Morton Denlow |
| | ) | |
| Defendant. | ) | |

TO: **THE HONORABLE SUZANNE B. CONLON
UNITED STATES DISTRICT JUDGE**

## REPORT AND RECOMMENDATION

This matter comes before the Court for the purpose of conducting a hearing and entering a report and recommendation concerning Defendant Frederick Davis' motion to suppress. (Minute order 5/16/00, Judge Conlon). The motion raises the issue of whether there was reasonable suspicion to stop and question Defendant which ultimately led to his arrest. The Court conducted an evidentiary hearing on May 24, 2000. The Court has considered the testimony of the three witnesses who testified at the hearing and the arguments of counsel. The following constitute the Court's findings of fact and conclusions of law in which it is recommended that the motion to suppress be denied.

# I. FINDINGS OF FACT

1.     In the course of an investigation begun on May 16, 2000, into possible drug dealing by Defendant Duvon Miller ("Miller"), the Drug Enforcement Administration Task Force ("DEA") arranged for a drug sale to Miller to take place on March 21, 2000 in a K-Mart parking lot at 79th Street and South Harlem Avenue in Chicago, Illinois. The planned sale was for multi-kilograms of cocaine at $20,000 per kilo.

2.     On March 21, at approximately 3:15 p.m., Miller and two other defendants, Claude Johnson ("Johnson") and Myron Gaston ("Gaston"), were arrested at the K-Mart parking lot in connection with the proposed sale of cocaine by a DEA undercover agent, Task Force Officer Luis Dominguez ("Dominguez") to Miller, Johnson and Gaston. At the time of the sale, Miller stated that they had $40,000 with them to purchase two kilos. Approximately $44,000 was recovered from Miller, Johnson and Gaston at the time of their arrest.

3.     In the course of the investigation and prior to the arrest of Miller, Miller told Dominguez that other friends of his were at his "crib" or were on their way to his "crib" with additional money to complete the cocaine purchase. Miller resides at 7920 S. Homan Avenue in Chicago, Illinois. ("Residence").

4.     Following the arrest of Miller, Johnson and Gaston in the K-Mart parking lot, Dominguez directed three cars of DEA agents to stake out the Residence in order to

apprehend the other persons involved with Miller in attempting to purchase cocaine from undercover agent Dominguez. The Residence was a single-family Chicago style bungalow.

5.     The DEA agents arrived at the Residence at approximately 3:30 p.m. and stationed themselves in unmarked cars around the Residence. Miller did not provide any description, identification or other information concerning the persons he expected to be waiting at or coming to the Residence. When the DEA agents arrived, there were no cars parked in front of the Residence, and they did not observe any people who were waiting outside the Residence.

6.     After waiting for between 45 minutes to an hour, the DEA agents observed a green Ford Mustang stop in front of the Residence at between 4:15 and 4:30 p.m. There were two occupants in the vehicle, defendant Michael Jones ("Jones") in the driver's seat, and defendant Davis in the passenger seat.

7.     Davis left the vehicle and went to the door of the Residence. He appeared to ring the bell and knock on the door. When no one answered, he immediately returned to the car and entered the passenger side. Davis made no other effort to gain entry to the Residence. The DEA agents did not observe any illegal conduct on Davis' part.

8.     The DEA Task Force Supervisor directed the agents to stop and question the occupants of the vehicle.

9.      The green Ford Mustang made a u-turn and traveled several blocks before the car was pulled over by the DEA agents. The agents decided to let the vehicle proceed several blocks before pulling it over, in order that the stop would be made away from the Residence.

10.     DEA Task Force Officer Chris Geer ("Geer") was the driver of the DEA vehicle which pulled the Ford Mustang over by means of flashing lights. He testified at the hearing. He approached the vehicle on the driver's side and asked both passengers to exit. Geer was accompanied by another DEA agent. They both wore clothing which clearly identified them as law enforcement officers and they carried guns on their hips which were visible. They did not draw their weapons.

11.     The driver's door in the Ford Mustang was not functioning, so both occupants exited on the passenger's side.

12.     Geer asked Davis for identification which Davis provided. Jones, the driver, was taken down the sidewalk for separate questioning. Geer began questioning Davis. Davis told Geer that the Ford Mustang was his car and that he and Jones were "out and about." Geer asked Davis if he had been to the Residence. Davis denied it. Geer then read Davis his Miranda rights and asked Davis if he could search the vehicle. Davis said yes. Geer questioned Davis for an additional 15-30 minutes during which Davis reluctantly agreed that he had been at the Residence after Geer told him that the DEA agents had seen him there.

13.     Upon a search of the vehicle, the DEA agents recovered evidence which they intend to use at the forthcoming trial of Davis. This evidence includes over $20,000 in cash, a piece of paper with Duvon Miller's cellular phone number and a cellular phone.

14.     In the report later prepared by Geer, he did not state that he had given Davis his Miranda warnings. Geer would usually include that information in his report, but did not do so in this instance. Geer looked for but could not locate a written consent to search form for Davis to sign. The Court finds that Geer read Davis his Miranda warnings and obtained a verbal consent to search the vehicle.

15.     Geer acknowledged that prior to pulling Davis over, he had no description of any person, he had no idea as to how many people he was looking for, and no idea what cars might be waiting or pulling up at the Residence. No agent left any of the three stake out vehicles to see if anyone was waiting at the Residence.

16.     DEA Agent Tyler James Kruse ("Kruse") also testified. He was in a different car conducting the stake out at the Residence. After the Mustang was stopped, he was present and heard Davis deny that he had stopped at the Residence, he heard Geer read Davis his Miranda rights and he heard Davis verbally consent to a search of the Ford Mustang. The Court finds Kruse's testimony to be credible.

17.     Prior to the stop, none of the DEA agents had ever before seen Davis, nor had they ever heard his name mentioned by Miller or anyone else.

18.    No traffic citation was ever issued in connection with the stop.  The DEA agents pulled the Ford Mustang over for the purpose of questioning the occupants to determine their possible involvement with Miller in purchasing cocaine.

19.    DEA Agent Daniel Foley ("Foley") was the third witness.  He testified that DEA Agent Dominguez told other agents that Miller expected people to show up at the Residence with money to purchase cocaine.

## II. CONCLUSIONS OF LAW

### A.    STANDARD FOR AN INVESTIGATORY STOP.

The motion to suppress turns on the issue of whether the DEA agents could properly stop Davis for questioning.  The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the green Ford Mustang,  *U. S. v. Cortez*, 449 U. S. 411, 417, 101 S. Ct. 690, 694 (1981).  An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.  *Id.*

In *Terry v. Ohio*, 392 U. S. 1, 30, 88 S. Ct. 1868, 1884-85 (1968), the Supreme Court held that police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.  The officer must be able to articulate something more than a hunch.  *Id.*, at 27, 88 S. Ct. at 1883.  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  *INS v. Delgado*, 466

U. S. 210, 217, 104 S. Ct. 1758, 1763 (1984). The level of suspicion required for a *Terry* stop is less demanding than for probable cause. *U. S. v. Montaya de Hernandez*, 473 U. S. 531, 541, 105 S. Ct. 3304, 3310 (1985).

The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. *Florida v. J. L.*, ___ U. S. ___, 120 S. Ct. 1375, 1379 (2000). The police must be able to give a rational explanation for why they suspected the person they stopped. *U. S. v. Feliciano*, 45 F.3d 1070, 1072 (7th Cir. 1995). The reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White*, 496 U. S. 325, 330, 110 S. Ct. 2412, 2416 (1990).

In evaluating the reasonableness of an investigative stop, courts must consider "the totality of the circumstances – the whole picture." *U. S. v. Cortez*, 449 U. S. 411, 417, 101 S. Ct. 690, 695 (1981). Based on that whole picture the detaining officer must have a particularized and objective basis for suspecting the person stopped of criminal activity. *Id.*, at 417. Before a stop is permissible, the two elements of "particularized suspicion" must be satisfied. First, the assessment of the "whole picture" must be based on all of the circumstances and, second, the process must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. *Id.*, at 418. However, "the process doesn't deal with hard certainties, but with probabilities." *Id.*, at 418. Furthermore, "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be

combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Id.*, at 419.

In evaluating the reasonableness of an investigative stop, the court examines (1) whether the officers' action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *U. S. v. Price*, 184 F.3d 637, 640 (7th Cir. 1999).

## B.  THE REASONABLE SUSPICION STANDARD WAS MET.

The reasonable suspicion standard for a police officer to stop and briefly detain a person for investigative purposes as set forth in *Terry v. Ohio*, has been met. The standard requires the officer to have a reasonable suspicion supported by articulable facts that criminal activity is afoot.

In the instant case, the agents involved in the stop of Davis' vehicle were given facts by Miller that others were at or would be arriving at the Residence with additional money to purchase cocaine. The information was not given to the agents as an anonymous tip or as part of a plea bargain after Miller was arrested. The information was given during the process of negotiating the purchase of multi-kilos of cocaine prior to Miller's arrest. Therefore, Miller provided the agents with articulable facts that others would be participating in the cocaine purchase at his Residence. At the time of the arrest of Miller, Johnson and Gaston, over $40,000 was recovered. The DEA agents reasonably suspected other parties would arrive at Miller's Residence with money to purchase more cocaine.

8

## C.  THE INVESTIGATIVE STOP WAS REASONABLE.

The investigatory stop by the DEA agents was based on their reasonable suspicion. The officers' actions were justified at their inception, and they were reasonably related in scope to circumstances that justified the interference in the first place.

### 1.  The Objective Manifestation Requirement.

The reasonable suspicion the agents relied on was justified by the "objective manifestation" required in *U. S. v. Cortez*, 449 U. S. 411, 417, 101 S. Ct. 690, 695 (1981). The agents were in the process of conducting surveillance at the Residence (a single-family dwelling) approximately fifteen minutes after the arrest of Miller. Miller had given the agents information that others would be waiting or arriving at the Residence to purchase additional kilos of cocaine. The agents had observed the Residence for approximately 45 minutes to an hour when Davis arrived, approached the Residence, range the doorbell and knocked on the door. When there was no answer, Davis returned to the vehicle and attempted to drive away. Davis was the first and only person to arrive at the Residence the entire time the surveillance was being conducted. Based on the information provided by Miller that others would be arriving at the Residence with money to purchase cocaine, Davis' actions of attempting to gain entrance to the Residence was consistent with the information provided, took place at the expected location, and within a relatively short period of time. Because the Residence was a single-family unit, the DEA agents could see Davis at the Residence.

9

## 2.    The Agents' Actions Were Justified.

In the instant case, the agents' actions were reasonable in light of the information they obtained before they stopped Davis. The agents did not cite the driver for a traffic violation or any other violation. Although the DEA agents did not observe Davis engage in any criminal conduct, this did not prevent the DEA agents from stopping him for questioning where they expected a co-conspirator to arrive to purchase multi-kilo quantities of cocaine. The Supreme Court has recognized that "a series of acts, each of them perhaps innocent" if viewed separately, "but when taken together warranted further investigation." *Terry*, 392 U. S., at 22, 88 S. Ct., at 1881.

## D.    THE TOTALITY OF THE CIRCUMSTANCES JUSTIFIED THE STOP.

When assessing the whole picture based on all of the circumstances in this case, the agents' suspicion that Davis was engaged in the drug conspiracy was justified. The investigation began on May 16, 2000 and the arrests were made on May 21. The DEA agents had information from Miller that additional people would be arriving at his Residence to complete the purchase of kilos of cocaine. Miller and two co-defendants were arrested with over $40,000 as they attempted to make their purchase. Davis was the only person observed attempting to gain entry to Miller's residence shortly after Miller informed the agents that other people would be at the Residence. The information provided by Miller could be viewed as reliable because it was provided at a point in time prior to his arrest while the cocaine purchase was still unfolding.

The totality of the circumstances test requires that "the evidence thus collected must be seen and weighed not in the terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *U. S. v. Cortez*, 449 U. S., at 418, 101 S. Ct., at 695. The limited purpose of the stop in this case was to question the occupants of the vehicle about their reasons for stopping at the Residence at a time when cocaine purchasers were expected to arrive. No search of the vehicle took place until after Davis lied that he had not been at the Residence and after he was read his Miranda rights and consented to a search of the car. The intrusion upon privacy associated with this stop was limited and was "reasonably related in scope to the justification for [its] initiation." *Terry v. Ohio*, 392 U. S., at 29, 88 S. Ct., at 1883.

## III. CONCLUSION

**The Court recommends that Defendant's Motion to Suppress be denied.** The agents had a reasonable suspicion supported by articulable facts and the totality of the circumstances that Defendant Davis was involved in criminal activity at the time the agents stopped his vehicle. He was read his Miranda rights and consented to a search of the vehicle. The evidence was lawfully obtained.

**Respectfully submitted,**

**MORTON DENLOW**
**United States Magistrate Judge**

Date: May 31, 2000

11

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections with the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation. See Fed. R. Civ. P. 72(b); 28 U.S.C. 636(b)(1)(B); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir. 1995); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258 (7th Cir. 1989).

**Copies Have Been Delivered in Open Court or Mailed to:**

William R. Hogan, Jr.
Assistant U. S. Attorney's Office
219 South Dearborn Street
Chicago, IL 60604
312/353-5300
**Attorney for Plaintiff**

Gerald J. Collins
100 West Monroe Street
Suite 1310
Chicago, IL 60603
312/641-1950
**Attorney for Defendant**